*In the Matter of the Marriage of Houser*, No. 34, September Term, 2024. Opinion by Eaves, J.

**CHILD SUPPORT AND ARREARS – NON-WAIVABLE ISSUE**

The Supreme Court of Maryland held that, in a divorce and custody proceeding, parents may not waive—even in a bilateral agreement—the issue of child support and arrears because child support is a legal obligation on the part of the parents, and the right to receive that support is held by the minor, not the parents. Thus, the child's right to support cannot be bargained away or waived by the parents.

**U.S. CONST. AMEND. XIV – SUBSTANTIVE DUE PROCESS – PARENTAL RIGHTS**

The Supreme Court of Maryland held that a parent's fundamental right to determine the care, custody, control, and management of their children does not include the ability of parents to waive or forgo the issue of child support because child support is a parental obligation, not a parental right. The Supreme Court, therefore, held that lawfully ordered child support—over the parties' objections—does not violate a parent's fundamental rights in the care, custody, control, and management of their children.

**MD. CODE ANN., FAMILY LAW § 12-204(d) – ABOVE-GUIDELINES CASE – NO ABUSE OF DISCRETION**

The Supreme Court of Maryland held that the trial court did not abuse its discretion in rejecting the parents' agreement to pay/receive no child support when the trial court repeatedly requested justification for the parties' request and the parties proffered only insufficient reasons for providing no child support in an above-guidelines case.

Circuit Court for Anne Arundel County
Case No. C-02-FM-20-002520
Argued: March 3, 2025

IN THE SUPREME COURT

OF MARYLAND

No. 34

September Term, 2024

IN THE MATTER OF THE MARRIAGE OF
HOUSER

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough

JJ.

Opinion by Eaves, J.

Filed: June 27, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

# I
# INTRODUCTION

Beginning in the early 20th century, the Supreme Court of the United States recognized that parents have a fundamental liberty interest—protected by the Due Process Clause of the Fourteenth Amendment—to "establish a home and bring up children[.]"[1] This right has more frequently and commonly been described as a parent's right to the "care, custody, and control of their children[.]"[2] Since 1990, in order to comply with federal law, the use of child support guidelines in Maryland has been mandatory.[3] Section 12-202(a)(2)(i) of the Family Law Article ("FL") of the Maryland Annotated Code (2019 Repl. Vol) states that, when the child support guidelines are used, there is a rebuttable presumption that the amount of child support calculated by use of the guidelines is the correct amount to be awarded. In cases where parents' combined actual monthly income exceeds what the guidelines contemplate, however, the circuit court retains discretion to determine the appropriate amount of child support to award.[4]

---

[1] *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).

[2] *Troxel v. Granville*, 530 U.S. 57, 65 (2000).

[3] 1990 Md. Laws, ch. 58; *Damon v. Robles*, 245 Md. App. 233, 239 (2020) ("To maintain eligibility for federal funding relative to paternity and child support, Title IV-D of the Social Security Act, 42 U.S.C. § 651, *et seq*. obligates States to have certain laws in effect.").

[4] FL § 12-204(d).

In this case, Erica Hall[5] and Nicholas Houser married in 2012. The parties have one minor child ("C.H."), who was born in July 2018. In 2020, the parties each sought an absolute divorce. On the morning of trial, the parties presented to the Circuit Court for Anne Arundel County three agreements purporting to resolve all issues among them—including the issue of child support. In short, the parties agreed that the circuit court should award no child support and that the calculated arrears should be waived.

The circuit court gave ample opportunity to the parties to explain why an award of no child support and waiving the arrears was in C.H.'s best interest. The parties primarily argued that they are fit and proper parents and that the court should not interfere with their constitutional right to decide what is in C.H.'s best interest. Ultimately, the court concluded that waiving child support was in the best interest of the parents, not the child, and ordered Mr. Houser to pay child support and arrears to Ms. Hall, who was C.H.'s primary custodian. The circuit court otherwise incorporated into the judgment of absolute divorce the parties' agreements concerning the care and custody of C.H, as well as property distribution. On appeal, the Appellate Court of Maryland affirmed both the circuit court's rejection of the parents' agreement regarding child support and its award of child support and arrears.[6]

---

[5] At the time Ms. Hall initiated the underlying proceeding, her name was "Erica J. Hall Houser." In the eventual judgment of absolute divorce, Ms. Hall was awarded use of her former name.

[6] *Houser v. Houser*, 262 Md. App. 473, 503–04 (2024).

We granted Ms. Hall's petition and Mr. Houser's cross-petition for a writ of certiorari[7] to answer five questions, which we have condensed into three:[8]

1. May parents bilaterally agree to withdraw child support and arrears as a justiciable issue from the trial court?

2. Does a trial court violate parents' constitutional rights when it rejects an agreement between the parties to waive child support and arrears?

3. Did the trial court abuse its discretion in this case when it rejected an agreement between the parties to waive child support and arrears?

---

[7] *In re Marriage of Houser*, 489 Md. 244 (2024).

[8] The original five questions presented were:

1. Did the trial court err when it issued a child support order after the parties had voluntarily withdrawn child support as a justiciable issue, and the court did so over the objections of the parents who the court found to be fit and proper?

2. Did the trial court mis-apply the statute, or abuse its discretion, when the court ordered child support and arrears over the express objection of the parents who the court found to be fit and proper?

3. Did the trial court violate the parents' constitutional rights when the court sua sponte, and without evidence, rejected their agreement regarding the financial support of their child when the parents were found to be fit and proper?

4. Does the Maryland child support statute permit parents to waive a party's child support obligation, as part of a global settlement agreement, where the parties have shared physical custody, and their combined adjusted gross income exceeds the highest level of income set forth in the Maryland child support Guidelines?

5. Does the ACM's decision have a chilling effect on parents' rights to enter into agreements that they believe to be in their children's best interest?

3

As we explain, we answer each question in the negative, affirming the judgment of the Appellate Court.

## II
## BACKGROUND

Ms. Hall initiated divorce proceedings against Mr. Houser in September 2020 by filing a complaint in the Circuit Court for Anne Arundel County. In that complaint, Ms. Hall sought, among other things, an absolute or, in the alternative, a limited, divorce based on separation;[9] sole legal and primary physical custody; and child support—both on a permanent and temporary basis—and arrears. In Mr. Houser's operative amended counter complaint, he sought virtually the same relief.[10]

The parties appeared before the circuit court for a trial in January 2023. On the morning of trial, the parties informed the trial court that they had executed three separate agreements—a Property Settlement Agreement, a Custody and Parenting Agreement, and a Child Support Agreement—and that all issues between the parties were resolved. The Child Support Agreement, which is at issue here, states, in relevant part, the following:

> 2.2 Arrears: The parties agree Husband has not paid any child support from the date of filing of the Complaint by Wife in September 2020 through

---

[9] At the time of Ms. Hall's complaint, a request for a divorce based on separation required spouses to "have lived separate and apart without cohabitation for 12 months without interruption before the filing of the application for divorce[.]" FL § 7-103(a)(4) (2019 Repl. Vol.). Since then, the General Assembly revised § 7-103 by, among other ways, decreasing the 12-month requirement to a 6-month requirement. *Id.* § 7-103 (a)(1) (2024 Supp.); 2023 Md. Laws, ch. 646.

[10] Mr. Houser originally filed a *pro se* counter complaint in October 2020, which he withdrew about one week later. The next week, he filed, with the benefit of counsel, an answer and a new counter complaint, the latter of which he amended and is his operative pleading in this appeal.

the date this Agreement is executed. The parties have calculated Husband's child support arrears at approximately $41,708. However, the parties agree that there are no child support arrears as of the date of this Agreement and Wife *waives* any entitlement to child support arrears.

2.3 Support: The parties have consulted the Maryland Child Support Guidelines (attached as Exhibit A), which are inapplicable to their case as their case was filed prior to October 1, 2020 and, as such, they are an "above-guidelines" case since their combined income exceed—and at all times have exceeded—$15,000 per month. Therefore, after consulting with the Maryland Child Support Guidelines and *considering the best interests of their minor child*, the parties agree that each party shall each be generally charged with support for the minor child when he is in their respective care and custody. *The parties both agree that this is in the best interests of the minor child*. The parties understand that the *waiver of child support* is significant and recognize the legal impact of the same.

(Emphases added). The Child Support Agreement also discussed the recurring expenses for C.H. for which each parent would be responsible. Specifically, the Agreement stipulated that Ms. Hall was responsible for extracurricular activities, childcare, and extraordinary medical expenses, while Mr. Houser was responsible for maintaining medical insurance for C.H. Under the Child and Parenting Agreement, the parties would have shared physical custody of C.H., with Ms. Hall having custody of C.H. approximately 61 percent of the time, and Mr. Houser having custody approximately 39 percent of the time.

At trial, Ms. Hall's attorney stated that the parties had executed the three agreements because they "[did not] want the Court to use the child support guidelines[]" but that the parties "kn[e]w the Court's policy on that,[11] so [they] ha[d] a couple of different ways to

---

[11] In her brief in this Court, Ms. Hall states that the "Circuit Court for Anne Arundel County has enforced a unique, and unwritten local rule requiring every child support order to conform with the Child Support Guidelines. This requirement is not imposed by any

[proceed:]"

> So option 1, if the Court is not inclined to move forward without child support guidelines, is that we will simply move forward with what is in [the] [C]ustody and [P]arenting [A]greement and we will ask you to incorporate but not merge that into a judgment. But we will not ask you to incorporate but not merge the [C]hild [S]upport [A]greement or the [P]roperty [S]ettlement [A]greement.

> If Your Honor is inclined to allow us to deviate from the child support guidelines the way that we would like to, then we will incorporate all three.

When asked by the trial court what the parties were requesting it to do regarding child support, Ms. Hall's counsel replied, "zero." When asked why by the trial court, counsel replied, "[w]ell, basically that is what the[ Child Support A]greement is." The trial court explained that it "[did not] want to blow off the [Child Support A]greement," but that it was "not willing to order to just waive child support" without finding that such an agreement was in C.H.'s best interest, which "is an uphill battle." Recognizing this, the parties asked the court to proceed by incorporating the Parenting and Custody Agreement but not the Property Settlement Agreement and the Child Support Agreement.

---

other circuit court in the State." At oral argument before the Appellate Court of Maryland, when pressed by the panel of that court on what this "local rule" was, Ms. Hall's counsel stated, "No other circuit court does this, none." Counsel further stated that, in other counties, "if parents walk in with a full agreement and they're represented by counsel, [the agreement] is accepted almost without reservation." When asked if there was any factual basis to support that conclusion other than counsel's representation to the court, counsel replied, "[n]ot on the record[,]" but that his assertion was based on his personal experience. The Appellate Court was not persuaded by that explanation. We agree and see no basis to accept the assertion that the Circuit Court for Anne Arundel County is an outlier jurisdiction by, as we explain below, complying with the law as it pertains to the application and calculation of child support, indicating that *every other* jurisdiction in the State is running afoul of the law by rubber stamping every agreement concerning child support.

The trial court rejected that proposal, explaining that if it were to resolve child custody, it would be required to address child support but that it would "deviate if it [were] in the best interest of the child[.]" The trial court explicitly gave the parties the opportunity to make that showing:

> I am not willing to order to just waive child support. I have to make a finding that it is -- which is really a difficult finding. That you know, in the best interest of the minor child or children to receive no child support.

> \*  \*  \*

> There is case law that says that the Court has an obligation to explore child support and to order child support. Unless you can -- I mean, I will deviate if it is in the best interest of the child, which you know I don't know if you want to try to explain to me more why I shouldn't order child support. I am happy to hear it.

> \*  \*  \*

> So if you want to put on the record . . . why you believe a child support order of zero is appropriate at this point, I am happy to -- I mean, at this point I might as well let you put it on the record and I will tell you yes or no.

In response, the parties presented arguments about assignment to Ms. Hall of the marital property's equity[12] and transportation costs covered by Mr. Houser in picking up and dropping off C.H. to Ms. Hall. The court concluded that the equity in the marital home and travel expenses did not influence child support in any way. The trial court asked Ms. Hall if there was some reason she was not seeking child support, to which she replied, "I believe that [t]his relationship is the most important and we have gone our separate ways

---

[12] Counsel for the parties estimated to the court that the equity in the marital home was about $25,000, such that Ms. Hall and Mr. Houser each were entitled to $12,500 in equity.

and supported ourselves and our child financially independently thus far and have done well, I think. And so moving forward, I would prefer not to have to deal with any money." Ms. Hall argued that the parties have been financially independent for approximately three years since their separation on February 14, 2020, and have been able to independently financially care for C.H.

In addition, the parties made a legal argument to support their agreement to waive child support. The parties argued that, although FL §§ 12-201 and 12-202(a) provide courts with the authority to set child support, "there is no better person on the planet . . . than the biological parents of a child to [determine] what they believe is in their child's best interest[,]" and that a court does not have the authority, absent a finding of parental unfitness, to second guess the parties' determination as to child support. To support this assertion, they argued that, under *Troxel v. Granville*, 530 U.S. 57 (2000), two fit and proper parents have the constitutional right to determine how to raise their child. Accordingly, the parties asked the court to incorporate, but not merge, the three agreements into the judgment of absolute divorce.

After considering the testimony and legal arguments, the trial court received into evidence the Property Settlement Agreement and the Custody and Parenting Agreement, with the exception of one paragraph in the latter that related to child support. The court did not receive into evidence the Child Support Agreement because it believed that the Child Support Agreement was "not lawful" and "violate[d] the law." The trial court explained that "[t]he parties' agreement to exchange no child support ha[d] not been justified in any way . . . other than the[ir] belie[f] . . . that as two fit parents, they are entitled to make that

8

decision on their own[.]" The trial court, thus, determined that waiving child support was "in [the parents'] best interest, . . . not in the child's best interest[.]" Based on the testimony provided,[13] the trial court ordered Mr. Houser to pay child support to Ms. Hall in the amount of $2,105 per month. The trial judge also calculated Mr. Houser's arrears to be $41,708. Those arrears were to be paid off at a rate of $195 per month, resulting in a total monthly payment by Mr. Houser to Ms. Hall in the amount of $2,300. All this was included in the court's February 2023 Judgment of Absolute Divorce, which both Ms. Hall and Mr. Houser timely appealed.

In a reported opinion, the Appellate Court of Maryland affirmed the judgment of the circuit court. *Houser v. Houser*, 262 Md. App. 473 (2024). Both parties asked the Appellate Court to vacate the child support order and to permit the parties to waive the child support obligation and arrears. *Id.* at 488. The Appellate Court held that the circuit court correctly (1) considered child support, (2) applied the child support guidelines, and (3) determined that the parties' constitutional rights were not violated by rejecting the Child Support Agreement. *Id.* at 503–04. Ms. Hall and Mr. Houser filed a petition and a cross-petition for writ of certiorari, respectively, which this Court granted. *In re Marriage of Houser*, 489 Md. 244 (2024).

### III
### STANDARD OF REVIEW

---

[13] The relevant testimony on which the trial court based its award of child support were the following: Ms. Hall's annual salary of $74,000; Ms. Hall's coverage of C.H.'s daycare/pre-school tuition of $1,386 per month; Mr. Houser's annual salary of $170,000; and Mr. Houser's coverage of C.H.'s health insurance, which Mr. Houser "ballparked" to be $150 per month.

Where a trial court uses the guidelines to award child support, that determination will not be disturbed but for a clear abuse of discretion. *Gladis v. Gladisova*, 382 Md. 654, 665 (2004). However, "where the [child support] order involves an interpretation and application of Maryland statutory and case law, [this] Court must determine whether the [trial] court's conclusions are 'legally correct' under a *de novo* standard of review." *Walter v. Gunter*, 367 Md. 386, 392 (2002) (citing *In re Mark M.*, 365 Md. 687, 707 (2001)). Additionally, "interpretation of the United States Constitution [and federal case law outlining the contours of federal constitutional rights] . . . is a question of law independently reviewed under a *de novo* standard." *In re: Special Investigation Misc. 1064*, 478 Md. 528, 545–46 (2021).

## IV
## ANALYSIS

In this case, the parties agree with each other and are not presenting any opposing legal arguments. While Ms. Hall and Mr. Houser do not individually make all the arguments we address, we refer to their separate (or collective) arguments as being advanced by "the parties," as neither has adopted or advanced a position contrary to the other. Before this Court, the parties make three broad arguments (with other minor arguments that we address throughout). First, they argue that the trial court erred in awarding child support because "the parties . . . were not in dispute regarding child support, and had actually dismissed any claim regarding child support, [so] the circuit court had no authority to rule on that subject." Second, the parties assert that the trial court violated their "constitutional right to parent" when it ordered child support over their objection. Third,

the parties argue that the trial court abused its discretion when it awarded child support and arrears over their express objection. For the reasons discussed below, we disagree with the parties and affirm the judgment of the Appellate Court.

### A. Parents Cannot Waive the Issue of Child Support

The parties first argue that child support was never an issue before the circuit court because they "d[id] not request child support." Alternatively, they posit that the "circuit court had no authority to rule on [the issue of child support]" because "the parties in this case were not in dispute regarding child support[] and had actually dismissed any claim regarding child support[.]" Thus, they argue that the circuit court, in deciding the issue of child support, rendered an advisory opinion. The parties also rely on Maryland Rule 2-506(a), which governs voluntary dismissals, asserting that, because they "jointly withdrew" child support as an issue on the morning of trial, the trial court erred when it nevertheless adjudicated the issue of child support against their wishes.

Parents of a minor child "are jointly and severally responsible for the child's support, care, nurture, welfare, and education[.]" FL § 5-203(b)(1). This legal obligation to support a minor child is also a "moral obligation[,]" which "is [a] well-settled [principle] in Maryland [law]." *Petrini v. Petrini*, 336 Md. 453, 459 (1994). Because the obligation is to support the child, Maryland courts have long recognized that the right to child support is a right held by the minor child—not a right held by the parent to whom the child support is paid. *See Knott v. Knott*, 146 Md. App. 232, 248 (2002) ("[I]t is presumed that the parent in whose custody the child resides fulfills his or her obligation of support directly; the other parent's support obligation then must be translated into dollars and paid to the custodial

11

parent, *for the child's benefit*." (emphasis added)); *Lacy v. Arvin*, 140 Md. App. 412, 422 (2001) ("A parent owes this obligation of support to the child, not to the other parent, and owes it to the child regardless of whether the child was the product of a marriage." (internal citation omitted)); *Rand v. Rand*, 40 Md. App. 550, 554 (1978) ("The fixing of child support derives from the obligation of the parent to the child, *not from one parent to another*." (emphasis added)).

Because child support is a right held by, and obligation to, the minor child, Maryland courts have repeatedly stated that a court need not accept an agreement between parties regarding decisions about their child support obligations and that such obligations cannot be waived or bargained away. *See Walsh v. Walsh*, 333 Md. 492, 503–04 (1994) ("[W]hile parties are encouraged to settle domestic disputes . . . they must be mindful of the needs of their children. When a judge approves and incorporates an agreement of the parents into an order of support, the judge must do more than merely rubber stamp anything to which the parents agree."); *Stambaugh v. Child Support Enf't Admin.*, 323 Md. 106, 109–11 (1991) (holding that a mother was not allowed to waive child support arrears in exchange for the father's agreement to consent to the adoption of the children by the mother's current husband because, "[g]enerally, the duty to support one's minor children may not be bargained away or waived[]"); *Stancill v. Stancill*, 286 Md. 530, 535 (1979) ("[T]he chancellor cannot be handcuffed . . . by any understanding between parents."); *Guidash v. Tome*, 211 Md. App. 725, 739 (2013) ("[P]arents may not waive or bargain away a child's right to receive support."); *Bornemann v. Bornemann*, 175 Md. App. 716, 731 (2007) ("[T]he duty to support one's child cannot be waived by contract."); *Corapcioglu v.*

12

*Roosevelt*, 170 Md. App. 572, 606 (2006) ("A parent may not bargain away the child's right to support, and modification of that support, from the other parent.").

The parties' argument that child support was never an issue before the circuit court because they "d[id] not request child support" is factually incorrect. As noted earlier, both Mr. Houser and Ms. Hall requested child support (permanent and temporary) and arrears in their divorce pleadings. The parties sought to withdraw the issue of child support the morning of trial only after the circuit court stated that it would not accept into evidence the Child Support Agreement. Regardless, the parties' broad assertion that their bilateral agreement to waive any issue regarding child support, rendering child support a non-justiciable issue, has no basis in law. To the contrary, their argument flies in the face of our established caselaw holding that a minor child's right to such support cannot be bargained away or waived, as detailed above. *See, e.g.*, *Walsh*, 333 Md. at 503–04.

For that same reason, the parties' reliance on Maryland Rule 2-506(a) is misplaced. That rule states:

> *Except as otherwise provided in these rules or by statute*, a party who has filed a complaint, counterclaim, cross-claim, or third-party claim may dismiss all or part of the claim without leave of court by filing (1) a notice of dismissal at any time before the adverse party files an answer or (2) a stipulation of dismissal signed by all parties to the claim being dismissed.

Md. Rule 2-506(a) (emphasis added). As previously stated, the parties have a legal obligation to care for C.H. *See* FL § 5-203(b)(1). Permitting the parties to waive the issue of child support pursuant to Maryland Rule 2-506(a), such that a circuit court would be divested of authority to consider that issue, would violate a minor's right to the parental support guaranteed to them in FL § 5-203(b)(1). Thus, the parties had no right under

13

Maryland Rule 2-506(a) to withdraw the issue of child support from the circuit court's consideration because FL § 5-203(b)(1)—a statute—makes clear that the right to support belongs to the child, and the parties' interpretation of Maryland Rule 2-506(a) would allow parents to waive with unfettered discretion their children's rights.[14]

We, therefore, hold that parents cannot bilaterally agree to waive the issue of child support, thereby precluding the circuit court from considering that issue altogether. When custody of a minor child is presented as an issue to the circuit court, the issue of child support is, as a consequence, also properly before the circuit court—whether or not explicitly raised by the parties. *See* FL §§ 1-201(c)(3) (noting that when an equity court is exercising jurisdiction over the "custody, guardianship, visitation, *or* support of a child," the equity court may, among other things, "decide who shall be charged with the support of the child, pendente lite or permanently[]" (emphasis added)), 8-103(a) ("The court may

---

[14] In its opinion, the Appellate Court stated:

> [Mr. Houser] characterizes the effort to withdraw the request for child support as an oral amendment of the pleadings. He asserts that a court has no power to address issues not framed by the pleadings. [Mr. Houser] fails to recognize that, under Maryland Rule 2-341(b), a party can amend a pleading within 15 days of trial only by leave of court. Here, the putative amendment occurred on the morning of the trial itself. Neither party sought nor obtained leave of court for the purported amendment.

*Houser*, 262 Md. App. at 494 n.5. To the extent that the Appellate Court suggested that the parties could have amended the pleadings to remove the issue of child support from the trial court's consideration under Maryland Rule 2-341(b) if they had done so within 15 days of trial by leave of court, we reject that proposition. The parties fault the Appellate Court for relying on Maryland Rule 2-341(b), rather than Rule 2-506(a), but for the same reasons discussed above, compliance with Maryland Rule 2-341(b) also does not permit parents to remove the issue of child support from the circuit court's consideration.

modify any provision of a deed, agreement, or settlement with respect to the care, custody, education, or support of any minor child of the spouses, if the modification would be in the best interests of the child.");[15] *see also Wells v. Barile*, 358 P.3d 583, 589 (Alaska 2015) (holding that no abuse of discretion occurred when the trial court ordered a mother to pay child support even though the father did not request child support in his motion for modification of custody because "a significant modification of the physical custody schedule is likely to require a new child support determination, regardless of whether a parent requests it[]").

## B. *A Lawful Order of Child Support Does Not Violate Objecting Parents' Constitutional Rights*

The parties argue that parents have a constitutional right to raise their children as they see fit, and that court-ordered child support violates that right. Essentially, the parties posit that trial courts have "no authority to interfere with the parents' joint decisions regarding the care, custody and management of their children absent a powerful countervailing interest." (Citation modified).

---

[15] While FL § 8-103(c) provides an exception for the court's involvement if there is a waiver of *alimony* or *spousal support*, it otherwise says nothing about waivers of *child support*. Furthermore, even if the parties legally *could* waive the issue of child support, because Ms. Hall's prayer for relief included "any other relief necessary and appropriate based on the facts and circumstances of this case[,]" and because Mr. Houser's request for relief included "other such and further relief as the best interests of justice and [t]he nature of this case may require[,]" the trial court would not have erred in still addressing that issue. *Cf. Lasko v. Lasko*, 245 Md. App. 70, 82–83 (2020) (holding that, even though a wife in a contested divorce proceeding did not specifically ask the court to make a marital award under FL § 8-205(a), the wife's request for "all of the relief to which she may be entitled under the Family Law Article[]" permitted the trial court to nevertheless make such an award).

An individual's fundamental rights are secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. U.S. Const. amend. XIV ("No state . . . shall deprive any person of life, liberty or property without due process of law."). In a long line of cases, the Supreme Court of the United States has continuously held that parents have a fundamental right to direct the upbringing of their children. *See Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (noting that parents have the right to "establish a home and bring up children[]"); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents, . . . ." (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944))); *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972) ("This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition."); *Troxel v. Granville*, 530 U.S. at 65 ("The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court."). This Court has recognized that established right. *See, e.g.*, *McDermott v. Dougherty*, 385 Md. 320, 352 (2005) ("The Supreme Court [of the United States] has long recognized the right of a parent to raise his or her children as a fundamental one protected by the due process clause of the Fourteenth Amendment." (quoting *Shurupoff v. Vockroth*, 372 Md. 639, 650 (2003))).

And for all the Supreme Court has said regarding parents' fundamental rights in the upbringing of their children, it has never once said that court-ordered child support violates that right. Indeed, the Supreme Court's decisions touching upon parental rights have involved issues of custody, rearing, and the attempt to establish/sever the parental

16

relationship. *See Meyer*, 262 U.S. at 399–402 (holding that state law prohibiting teaching in the German language to students below the eighth grade was unconstitutional as violation of parental rights under the Fourteenth Amendment); *Yoder*, 406 U.S. at 232–35 (holding that State's compulsory-educational law conflicted with parents' sincerely held religious beliefs regarding the upbringing of their children, violating the Free Exercise Clause of the First Amendment); *Parham v. J.R.*, 442 U.S. 584, 587, 601–03, 606–07 (1979) (upholding state law that balanced the wishes of a parent to involuntarily commit their minor child to a state psychiatric hospital with the desires of the child); *Santosky v. Kramer*, 455 U.S. 745, 766–70 (1982) (explaining that due process requires a state to show by at least clear and convincing evidence why the parental relationship should be severed); *Rivera v. Minnich*, 483 U.S. 574, 576–77 (1987) (recognizing that paternity can be established by a preponderance of the evidence, which does not offend parents' fundamental rights); *Hodgson v. Minnesota*, 497 U.S. 417, 450–52 (1990) (holding that a two-parent notification requirement for a minor to obtain an abortion was unconstitutional); *Troxel*, 530 U.S. at 67 (invalidating state law that allowed any third party to petition a court for visitation with a minor and for a judge to award that visitation when the judge determined that such visitation was in the minor's best interest).

The parties' argument that court-ordered child support violates their constitutional rights conflates the notions of parental rights and parental obligations. The custody, care, and upbringing of one's child is a parental right, but child support, as discussed above, is a parental *obligation*. The Supreme Court has confirmed that a parent's rights do *not* include the right to give up any legal obligation to the child and that there is a difference

17

between a parental relationship and a parental obligation. *Contrast Rivera*, 483 U.S. at 576 (upholding a statute that required proving paternity by only a preponderance of the evidence, thereby triggering a father's obligation to pay child support), *with Santosky*, 455 U.S. at 747–48 (striking down a statute that permitted a state to terminate parental rights on a standard lower than clear and convincing evidence). In *Rivera*, the Supreme Court explicitly stated: "[T]he putative father has *no legitimate right and certainly no liberty interest* in avoiding financial obligations to his natural child that are validly imposed by state law." 483 U.S. at 580 (emphasis added). Thus, the Supreme Court has been clear that parents' fundamental rights as parents do not include the ability to evade their legal obligations to their children. The child support ordered here was, as we explain below, validly imposed under State law. Thus, the parties have no valid liberty interest in avoiding that legal obligation to C.H. *See id.*

> We recognize that, in *Reno v. Flores*, the Supreme Court stated:
>
> Even if it were shown, for example, that a particular couple desirous of adopting a child would *best* provide for the child's welfare, the child would nonetheless not be removed from the custody of its parents so long as they were providing for the child *adequately*. Similarly, "the best interests of the child" is not the legal standard that governs parents' or guardians' exercise of their custody: So long as certain minimum requirements of child care are met, the interests of the child may be subordinated to the interests of other children, or indeed even to the interests of the parents or guardians themselves.

507 U.S. 292, 304 (1993) (internal citations omitted).[16] But *Flores* merely reinforces the

---

[16] *Flores* concerned a federal regulation promulgated by the Immigration and Naturalization Service ("INS"), which stated that non-citizen juveniles in custody would be released, in order of preference, to a parent, legal guardian, or adult relative who were otherwise not themselves in INS detention. 507 U.S. at 297. If those individuals also were

idea that, if parents are fit and proper, i.e., they provide to their child at least the minimum required, so as not to constitute neglect, the State will not step in to second-guess those parental decisions simply because someone else could or would raise the child better. *See, e.g.*, *Santosky*, 455 U.S. at 753 ("The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State.").

As our courts recognize, one of the purposes of child support is to try to put children in the same circumstances in which they would have been but for the divorce. *See Smith v. Freeman*, 149 Md. App. 1, 18 (2002) (noting that "the guidelines are premised on the concept that 'a child should receive the same proportion of parental income, and thereby enjoy the same standard of living, he or she would have experienced had the child's parents remained together[]'" (quoting *Allred v. Allred*, 130 Md. App. 13, 17 (2000))). We recognize, of course, that after child support is ordered, the court has no authority to allocate that support in any particular fashion, even if it believes that a particular allocation would be in the child's best interest. The court merely has an obligation to ensure that the

---

in INS custody, then INS could consider whether to release the adult, but otherwise was required to "locate suitable placement . . . in a facility designated for the occupancy of juveniles." *Id.* (alteration in original). As relevant here, one of the arguments advanced in *Flores* was for "a somewhat more limited constitutional right: the right to an individualized hearing on whether private placement would be in the child's 'best interests'—followed by private placement if the answer is in the affirmative." *Id.* at 303. *Flores* merely held that "'[t]he best interests of the child' [wa]s likewise not an absolute and exclusive constitutional criterion for the government's exercise of the custodial responsibilities that it undertakes, which must be reconciled with many other responsibilities." *Id.* at 304. *Flores* otherwise did not concern the constitutional rights of parents to direct the upbringing of their children and is inapposite here.

ordered child support is distributed, ensuring that those resources can be made available to the minor child.

The parties, however, believe their parental rights extend a step further, focusing on the word "management" from the phrase "care, custody, and management." In their eyes, "it is a novel question whether the word 'management' simply encompasses previously described rights or means something new as it is applied in this case." And, in this case, the parties assert that "management" has a financial component because "[e]very single decision made by parents regarding their children involves a consideration of the costs involved." To be sure, the Supreme Court has sometimes described the parental right as a right to the "care custody, and management" of one's child. *See, e.g.*, *Santosky*, 455 U.S. at 753 (noting a parent's "fundamental liberty interest . . . in the care, custody, and management of their child"). This Court has parroted that language on multiple occasions. *See McDermott*, 385 Md. at 345; *In re Yve S.*, 373 Md. 551, 567 (2003). But for at least four reasons, we find no merit in the parties' argument that, in the few instances the Supreme Court has used the word "management" in describing parental rights, it somehow meant to imply that parents could not be subjected to court-ordered child support.

First, no case in which the Supreme Court used the word "management" to describe parental rights involved, at least directly, the issue of child support, so we doubt the Supreme Court meant to imply that the States were powerless to ensure that children receive the financial support to which they legally are entitled. Second, the words "care," "custody," and "management" include overlapping concepts and are interrelated. *See care*, Black's Law Dictionary (11th ed. 2019) ("[s]erious attention[]"); *custody*, *id.* ("The care

20

and control of a thing or person for inspection, preservation, or security."); *manage*, *id.* ("To conduct, control, carry on, or supervise."). Even if "management" could refer to financial management, when coupled with the words, "care" and "custody," we think the Supreme Court plainly was referring to traditional aspects of child rearing (custody, visitation, religious upbringing, education, etc.). Third, as we discuss in more detail below, the use of child support guidelines became mandatory to comply with *federal law*, *see Voishan v. Palma*, 327 Md. 318, 322 (1992), so it would be paradoxical if, in attempting to comply with federal statutory law, the States simultaneously were violating the United States Constitution. Fourth, to credit the parties' argument would mean that—for decades and on a daily basis—state courts throughout the country have been violating the constitutional rights of parents when those courts order child support. It is unlikely that a constitutional crisis of that magnitude has gone undetected, unaddressed, and unrectified since the early twentieth century.

The circuit court here did not place C.H. in the care, custody, control, and management of someone other than the parties. The circuit court did not interfere with C.H.'s religious or educational upbring. The circuit court did not in any way interject itself into the parties' decisions on how to raise C.H., or direct how any court-ordered child support must be spent on C.H., thereby implicating the parties' constitutional rights as parents. Rather, the circuit court merely ensured that C.H. received access to the financial support to which he legally is entitled, which is the very same financial support the parties have no legitimate interest in avoiding. *See Rivera*, 483 U.S. at 580.

Because parental rights under the Fourteenth Amendment do not, as we have

21

explained, include the right to avoid or forgo lawfully ordered child support, the parties' reliance on many of the cases we have discussed above is misplaced. For example, in *Troxel*, the Supreme Court of the United States reviewed a Washington state statute providing that any third party may petition a court for visitation at any time and that a court may order visitation rights to the third party when, in the court's eyes, visitation would serve the best interests of the child. 530 U.S. at 67. In that case, paternal grandparents petitioned for visitation with their grandchildren after the death of their son (the father of the children), and the trial court awarded visitation over the objection of the mother. *Id.* at 61. The Supreme Court, in a plurality opinion, held that the statute "violated [the mother's] due process right to make decisions concerning the care, custody, and control of her daughters." *Id.* at 75. In reaching this conclusion, the Supreme Court relied on decisions concerning the authority to make child-rearing decisions and when a state can—or cannot—override those decisions. *Id.* at 65–66.

In *Frase v. Barnhart*, a mother attempted to regain custody of her child from the foster parents with whom the child resided during the eight weeks that the mother was incarcerated. 379 Md. 100, 103–04 (2003). The circuit court awarded the mother custody with some conditions—two of which were that she apply for and obtain housing at St, Martin's, a local organization that assisted with poverty and homelessness, and that "[the child] spend every other weekend with [the foster parents.]" *Id.* at 106. On appeal, this Court, relying on *Troxel*, held that those two conditions impermissibly interfered with the mother's right to make basic decisions for her child and, thus, were invalid, given that the trial court did not find the mother to be an unfit parent. *Id.* at 125. As we noted in *Frase*,

22

*Troxel* stands for the proposition that "a State [cannot] infringe on the fundamental right of parents to make child rearing decisions simply because a . . . 'better' decision could be made." *Id.* (quoting *Troxel*, 530 U.S. at 72–73). In reaching that conclusion, we noted that the mother "explained why she did not want to leave her present place of residence and why, in particular, she did not want to move to St. Martin's;" and that the court failed to give deference "to [the mother's] objection[, instead] decid[ing] that it knew best where she should live." *Id.*

*Troxel* and *Frase* are textbook examples of the type of parental conduct that the Fourteenth Amendment protects and how the State cannot interfere with that parental conduct without satisfying the requisite level of scrutiny. The intimate decisions regarding where a child would live and with whom a child would spend time are decisions that lie at the heart of a parent's fundamental rights protected by the Fourteenth Amendment. No such right is implicated by this case. In contrast, here, the trial court did not second guess the parents concerning their Custody and Parenting Agreement, and—with the exception of a child support provision in it—accepted it and incorporated it into the judgment of absolute divorce. Nor did the court attempt to dictate how the child support to be paid must be spent. The circuit court took issue with only the parties' desire to waive child support altogether.

For all the reasons discussed above, we hold that the sphere of a parent's fundamental rights to dictate the care, custody, and management of their minor child does not include the right to bilaterally—after a divorce and custody proceeding has been

23

initiated—waive the child's right to support.[17]

## C. The Trial Court Did Not Abuse its Discretion by Ordering Child Support and Arrears

Before we address operation of the child support guidelines and their application to this case, we address a preliminary argument: Whether the guidelines can ever apply in an uncontested divorce and custody case. The parties argue that "[t]here is a superficial conflict in the Family Law Article between Title 8 and Title 12[]" such that the guidelines do not apply at all. Specifically, the parties claim that Title 8 applies to uncontested cases, as the one before us, and Title 12 applies only to contested cases. FL § 8-101 reads:

> (a) A husband and wife may make a valid and enforceable deed or agreement that relates to alimony, support, property rights, or personal rights.

___

[17] The parties occasionally reference the fact that there was no finding—prior to ordering the payment of child support—that either of them was not a fit and proper parent. To be sure, parental fitness, or the lack thereof, certainly plays a role when traditional parental rights are at stake, i.e., in determining whether the State can interfere with the child's upbringing or sever the parental relationship. *See In re Adoption of Ta'Niya C.*, 417 Md. 90, 103–04 (2010) (noting that, in a parental termination proceeding, "the court must focus on the continued parental relationship and require that facts demonstrate an unfitness to have a continued parental relationship with the child, or exceptional circumstances that would make a continued parental relationship detrimental to the best interest of the child[]" (citation modified)). As we have discussed, however, a parent's fundamental right to raise their child does not include the right to waive a financial obligation legally owed to the child. Thus, parental fitness plays no role in assessing one's child support obligation. Because the parties' fundamental rights as parents are not implicated by an award of child support, we do not engage with the parties' arguments concerning what level of scrutiny must be satisfied and how to balance the parents' fundamental rights against the best interest of the child. *See McDermott*, 385 Md. at 334 (noting that the fundamental right of parents is protected "absent a powerful countervailing interest[]" (quoting *Stanley*, 405 U.S. at 651)); *In re Sean M.*, 430 Md. 695, 711 (2013) (balancing "two important and countervailing interests"—a parent's "assumed fundamental right to be a part of raising [their child]" with the interest in "*timely* providing permanent and safe homes for children consistent with their bests interests by establishing an orderly adoption procedure" (citation modified)).

(b) A husband and wife may make a valid and enforceable settlement of alimony, support, property rights, or personal rights.

Simply because Title 8 permits parties to enter into financial agreements does not mean that child support under Title 12 is inapplicable. The two titles are not mutually exclusive. Title 8 permits parties to enter into certain agreements, but there is nothing that requires courts to accept those agreements at face value without otherwise being subject to governing law. *See Cronin v. Hebditch*, 195 Md. 607, 617–18 (1950) ("We find no basis[] . . . for holding that in Maryland any 'separation agreement' by which the parties agree that they shall separate or live apart, or one party agrees or purports to release or relinquish, without consideration, all interest in property of value of the other . . . is[] . . . valid and enforceable."). So too for the issue of child support. Parents *may* enter into child support (or other marital) agreements, but those agreements must comport with otherwise applicable law. Here, the child's statutory right to support, *see* FL § 5-203(b)(1), is a limitation on a parent's ability to contract away the issue of that child support to the other parent. Thus, it is irrelevant whether a divorce and custody matter is contested or uncontested. As we explain below, parents *may* enter into child support agreements, but those agreements still must comply with other applicable law. We, thus, find no merit in the assertion that these two titles in the Family Law Article conflict with one another.

## 1. Maryland's child support guidelines

Maryland's child support guidelines "were merely advisory when they were first adopted[.]" *Petrini*, 336 Md. at 460; *see* 1989 Md. Laws, ch. 2 (noting that the new

"guidelines are advisory only and give rise to no presumption or inference[]"). That changed when the United States Congress enacted legislation requiring the States to utilize child support guidelines to remain eligible for certain federal funding. *See Damon v. Robles*, 245 Md. App. 233, 239 (2020) ("To maintain eligibility for federal funding relative to paternity and child support, Title IV-D of the Social Security Act, 42 U.S.C. § 651, *et seq.* obligates States to have certain laws in effect."); *see also Voishan*, 327 Md. at 322 ("The federal mandate required that the guidelines be established and based on specific descriptive and numeric criteria and result in a computation of the support obligation." (citation and internal quotation marks omitted)). Maryland complied by making use of the child support guidelines mandatory. 1990 Md. Laws, ch. 58 ("FOR the purpose of requiring, instead of permitting, a court to use the child support guidelines established under certain provisions of law in certain proceedings[] . . . ."). When the guidelines were enacted, we noted that their need "was threefold: (1) to remedy a shortfall in the level of awards that do not reflect the actual costs of raising children, (2) to improve the consistency, and therefore the equity, of child support awards, and (3) to improve the efficiency of court processes for adjudicating child support[.]" *Voishan*, 327 Md. at 322 (citation modified). We now provide an overview of the relevant law concerning the use of the child support guidelines and the calculation of child support at the time the parties filed their operative pleadings.[18]

---

[18] After these divorce proceedings were initiated, the General Assembly revised the procedures for utilizing the guidelines, as well as the guidelines themselves. *See* 2020 Md. Laws, ch. 383 § 1 (revising FL §§ 12-201, 12-202, and 12-204). Chapter 383 went into effect on October 1, 2021, and the General Assembly specified that it was to apply only to

"[I]n any proceeding to establish or modify child support, whether pendente lite or permanent, the court *shall use* the child support guidelines set forth in this subtitle." FL § 12-202(a)(1) (emphasis added). "There is a rebuttable presumption that the amount of child support which would result from the application of the child support guidelines . . . is the correct amount of child support to be awarded." *Id.* § 12-202(a)(2)(i). To rebut the presumption, the parties must show that application of the guidelines "would be unjust or inappropriate in a particular case." *Id.* § 12-202(a)(2)(ii). In determining whether the presumption has been rebutted, the circuit court may consider:

> 1. the terms of any existing separation or property settlement agreement or court order, including any provisions for payment of mortgages or marital debts, payment of college education expenses, the terms of any use and possession order or right to occupy the family home under an agreement, any direct payments made for the benefit of the children required by agreement or order, or any other financial considerations set out in an existing separation or property settlement agreement or court order; and

> 2. the presence in the household of either parent of other children to whom that parent owes a duty of support and the expenses for whom that parent is directly contributing.

*Id.* § 12-202(a)(2)(iii). But the presumption cannot "be rebutted solely on the basis of evidence of the presence in the household of either parent of other children to whom that parent owes a duty of support and the expenses for whom that parent is directly contributing." *Id.* § 12-202(a)(2)(iv).

The guidelines themselves are found at FL § 12-204(e). That section contains a table where the intersection of the number of children and the amount of the parents' combined

cases filed on or after the effective date. *Id.* §§ 2–3. Thus, we apply the law as it was at the time the parties filed their operative pleadings.

27

adjusted actual monthly income yields the applicable child support obligation. *Id.* § 12-204(e). That support obligation is then "divided between the parents in proportion to their adjusted actual incomes." *Id.* § 12-204(a).[19]

A case involving child support is sometimes described as an "above-guidelines case." As one might expect, an above-guidelines case is "one in which the parties' combined adjusted income exceeds $15,000 per month—the highest level of income specified in the child support guidelines set out in FL § 12-204(e)[.]" *Ruiz v. Kinoshita*, 239 Md. App. 395, 425 (2018). In such a circumstance, "the court may use its discretion in setting the amount of child support[,]" FL § 12-204(d), but we have held that, in an above-guidelines case, "the guidelines . . . establish a rebuttable presumption that the maximum support award under the schedule [in FL § 12-204(e)] is the *minimum* which should be awarded[.]" *Voishan*, 327 Md. at 331–32 (emphasis added).

## 2. Applying the guidelines in this case

Because this was an above-guidelines case when filed, the parties are correct that determining the appropriate amount of child support to award was within the sound discretion of the trial judge. *See* FL § 12-204(d); *Karanikas v. Cartwright*, 209 Md. App. 571, 596 (2013) ("A trial court's child support award in an 'above-guidelines' case is reviewed under the abuse of discretion standard." (citing *Frankel v. Frankel*, 165 Md. App. 553, 587 (2005))). "[T]o be reversed 'the decision under consideration has to be well

---

[19] Section 12-204 details how to compute a parent's actual income. Because neither party alleges that the circuit court incorrectly calculated their respective actual income, we do not discuss those provisions.

removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.'" *In re Yve S.*, 373 Md. at 583–84 (quoting *In re Adoption/Guardianship No. 3598*, 347 Md. 295, 313 (1997)).

The parties first argue that the trial court should have simply awarded a general charge of child support to each party because this was an above-guidelines case and because the parties had shared physical custody of C.H. The parties base this argument on the fact that they have shared physical custody of C.H., as the phrase "shared physical custody" currently is defined. "Shared physical custody" currently is defined to mean "that each parent keeps the child or children overnight for more than 25% of the year and that both parents contribute to the expenses of the child or children *in addition to* the payment of child support." FL § 12-201(o)(1) (2019 Repl. Vol., 2024 Supp.) (emphasis added). That new definition was, however, part of the 2020 revision to the law concerning child support, which became effective October 1, 2021—a date after this case was filed. *See* 2020 Md. Laws, ch. 383 §§ 2–3.

So while that new definition may not apply here, even as a relatively new definition, FL § 12-201(o)(1) (2019 Repl. Vol., 2024 Suppl.) brought about no change in the law because it has long been understood that a parent's obligation of child support and the method of payment dictated by a court order for that support is not substituted by the parent's payment of the child's expenses while the child is in that parent's physical custody. *See Bradford v. Futrell*, 225 Md. 512, 519 (1961) ("[M]ost courts refuse to allow a [parent] to dictate how [they] will meet the requirements for support payments when the mode of payment is fixed by a decree of court. Thus [the parent] will not be credited for payments

made when [they] unnecessarily interposed [themselves] as a volunteer and made payments direct to the children of [their] own accord."). Thus, even before the adoption of FL § 12-201(o)(1) (2019 Repl. Vol., 2024 Suppl.), that two parents have shared physical custody does not obviate a parent's obligation to pay child support, as the law clearly contemplates that a parent can have shared physical custody and otherwise still be required to pay child support.[20]

Alternatively, the parties argue that this Court "has never considered whether parents can significantly deviate downward in [an] 'above-guidelines' case[]" and that we should "clarify that statutory landscape." We disagree and find our decision in *Voishan* controlling. In *Voishan*, we found persuasive the Attorney General, acting as amicus curiae, when he stated: "The [General Assembly's] judgment was that at such high income levels judicial discretion is better suited than a fixed formula to implement the guidelines' underlying principle *that a child's standard of living should be altered as little as possible by the dissolution of the family*." 327 Md. at 328 (emphasis added). We noted that the General Assembly neither intended the schedule of basic child support obligation delineated in FL § 12-204(e) to limit a judge's discretion under FL § 12-204(d) nor

---

[20] We recognize that trial courts sometimes generally charge each parent with support of a minor child (i.e., that each parent be responsible for the child when in their respective custody), but without also complying with guidelines' statutory framework, we find no basis in law for such practice. "General charges" of child support, unless followed by the applicable child support framework, violate the mandatory nature of the child support guidelines and potentially the child's right to child support. *See* FL §§ 5-203(b)(1), 12-202(a). Even if a trial court were to properly order a general charge of child support, that certainly would not mean that a parent's obligation to the child is "zero," as the parties requested of the trial court in this case.

intended that the principles underlying the guidelines be ignored in an above-guidelines case. *Id.* at 331. Thus, we held that, in an above-guidelines case, the rebuttable presumption is that an order of child support should be no less than the maximum afforded by the guidelines. *Id.* at 331–32. "Beyond th[at,] the trial judge should examine the needs of the child in light of the parents' resources and determine the amount of support necessary to ensure that the child's standard of living does not suffer because of the parents' separation." *Id.* at 332. In the years since *Voishan*, there does not appear to be any confusion among our courts concerning how to handle above-guidelines cases. *See, e.g.*, *Kaplan v. Kaplan*, 248 Md. App. 358, 365 (2020) ("[I]n an above-[g]uidelines case, the trial court, in exercising its significant discretion, may employ any rational method in balancing 'the best interests and needs of the child with the parents' financial ability to meet those needs.'" (quoting *Ruiz*, 239 Md. App. at 425)).

In this above-guidelines case, there was a rebuttable presumption that the correct amount of child support was at least $1,942, which was the maximum under the guidelines for support of one minor child.[21] *See Voishan*, 327 Md. at 331–32. We reiterate that, in addition to that rebuttable presumption, the trial court should consider the needs of the child and the parents' ability to maintain the child's standard of life pre-divorce. *See id.* In

---

[21] We recognize that the trial court ordered Mr. Houser to pay monthly child support of $2,105, arriving at that figure by utilizing the current guidelines, which otherwise would not have been applicable to this case. On appeal to this Court, the parties have not sought reversal of the trial court's award because it utilized the new guidelines. Rather, the parties have argued only that the trial court abused its discretion in declining to award no child support. The parties have otherwise taken no issue with the trial court's decision to award, in its discretion, $2,105 versus $1,942 based on the parties' failure to rebut the presumption we established in *Voishan*.

an above-guidelines case, the trial court certainly has discretion to award child support above the maximum under the guidelines. But to deviate downward from that rebuttable presumption, the parties are required to demonstrate to the trial court why such a deviation is warranted.

The parties did not make that showing here. Although not bound to the analytical framework for deviating in a case within the guidelines, the trial court considered some of the factors contained in FL § 12-202(a)(2)(iii). The trial court considered the Custody and Parenting and Property Settlement Agreements and admitted both into evidence (save the one clause previously noted). In addition, the trial court took testimony from both parties and asked them questions about the marital home, retirement assets, and more importantly, C.H.'s education, health, and residence.

The trial court admittedly did not want to "blow off" the parties' Child Support Agreement but properly recognized that the parties needed to show why ordering no child support was in C.H.'s best interest. The trial court gave the parties multiple opportunities to make that showing. The parties argued as reasons for a downward deviation only Mr. Houser's waiver of his interest in the marital home (at most $12,500), as well as the fact that Mr. Houser would be doing the "lion's share" of driving C.H. between North Beach, Calvert County, and Edgewater, Anne Arundel County. The trial judge noted that the parties' arguments were all things that are "factored in to what the guidelines call for[,]" (save, perhaps, the transportation costs)[22] but that those arguments would not carry the day.

---

[22] FL § 12-204(i) states:

We cannot say that the trial court's decision to reject the parties' request to award no child support was well-removed from any center mark. The trial court correctly recognized that the parties bore the burden to show why a deviation of child support from at least $1,942 to $0 would have been in C.H.'s best interest. While the parties cryptically alluded to a "rationale as to why . . . child support was not included[,]" they elected to put into the record only the two reasons noted above.[23] Those arguments were insufficient to overcome the "uphill battle" that everyone—the trial court and parties alike—knew the parties' request to be. Ultimately, the trial court considered all testimony and legal arguments as to why it was in C.H.'s best interest to receive no child support, concluding it was not in C.H.'s best interest. For the reasons discussed above, we cannot say that the trial court abused its discretion.

---

By agreement of the parties or by order of court, the following expenses incurred on behalf of a child may be divided between the parents in proportion to their adjusted actual incomes:

(1) any expenses for attending a special or private elementary or secondary school to meet the particular educational needs of the child; or
(2) *any expenses for transportation of the child between the homes of the parents*.

(Emphasis added).

[23] The parties' failure to provide sufficient reasons to support their agreement to waive child support and articulate how such a deviation would be in C.H.'s best interest potentially raises concerns regarding unequal bargaining power between parents and possible quid pro quo agreements. Thus, we reiterate that judges have the obligation to ensure that children do not suffer the consequences of any potential unfair agreements. *See Walsh*, 333 Md. at 504.

Setting aside that the parties failed to satisfy their burden as to why an award of no child support was in C.H.'s best interest, the parties' request itself would defeat one of the basic tenets of child support: to maintain C.H.'s standard of living had the parties not divorced. *See Voishan*, 327 Md. at 332; *Smith*, 149 Md. App. at 18. The parties argue: "Father supports and cares for [C.H.] nearly 40% of the year. This arrangement, combined with [Ms. Hall's] income—which the parties agree is sufficient to provide [C.H.] with the same lifestyle during her 60% custodial time—should have been considered and weighed in favor of the parties' agreement." But the parties' argument on this point presents the same circuitous logic that has plagued much of their arguments. In the realm of child support, something cannot be simply because the parties wish or declare it so.

C.H. lives mostly with Ms. Hall, and the marital home is Ms. Hall's and C.H.'s primary residence; C.H. attends a public elementary school located in the primary residence's school district. C.H. stays with Mr. Houser every Thursday and every other Friday through Monday. During the summer, C.H. stays one week with Ms. Hall and one week with Mr. Houser. The parties agree that their custody of C.H. breaks down to roughly 61 percent of the time with Ms. Hall and 39 percent of the time with Mr. Houser. Thus, the parties believe—without any detailed explanation—that it is in C.H.'s best interest for Ms. Hall, who, as of the date of trial, earns an income of roughly 44 percent of Mr. Houser's income and cares for C.H. 61 percent of the time, to receive no child support. Based simply on the numbers, it appears unlikely for Ms. Hall to provide the same type of lifestyle to C.H. that he enjoyed pre-divorce without *any* assistance from Mr. Houser in the form child support. *See Voishan*, 327 Md. at 332. Even if the parties could have maintained a similar

lifestyle for C.H. without the payment of child support, they nevertheless failed to meet their burden to demonstrate that possibility to the trial court—despite numerous pleas from the court to make that showing.

As we have discussed, parents cannot procedurally prevent a court from addressing the issue of child support, nor do they have a fundamental right to avoid their obligation to support their child. We do not, however, *per se* invalidate child support agreements between parents; rather, proponents of such agreements must adequately explain to the circuit court why, in a guidelines case, application of the child support guidelines is unjust or inappropriate, *see* FL § 12-202(a)(2)(ii), or, in an above-guidelines case, why the desired amount of child support comports with a balancing of the minor child's best interest and the parents' ability to provide that desired level of support, *see id.* § 12-204(d); *Voishan*, 327 Md. at 331–32; *Kaplan*, 248 Md. App. at 365.

Thus, we find little merit in the parties' contention that preventing them from making bilateral agreements concerning child support—without any court oversight—will have "chilling effect[s] on parents' rights to enter into agreements that they believe to be in their children's best interest." Specifically, the parties argue that it is "critical" for parents to be able to "negotiate comprehensive settlement agreements[.]" They explain that "trial [should be the] last resort, as parents know their children best[,]" so trial courts should "provide litigants with the opportunity to resolve their disputes privately[.]" Thus, in their eyes, "[p]recluding parties from negotiating deviations from the [g]uidelines . . . will . . . cause . . . agreements to crumble" because such preclusion would be "arbitrar[y]."

35

We do not disagree with the sentiment that parents know their children best, nor do we disagree with the notion that parents should try to resolve their marital and custodial disputes without court intervention. Nevertheless, the fact remains that, to legally end a marriage, the parties must involve the court system.[24] In ordering child support, the only thing with which the court is concerned is the child's best interest. Concerning child support, the State has an interest in and obligation to protect the child's legal right to the support to which they are entitled and to ensure that parents provide that support. *See* FL § 5-203(b)(1); *Walsh*, 333 Md. at 504 ("Judges have an obligation to assure that children do not suffer because of any disparate bargaining power of their parents."). The parties have provided no evidence of a "chilling effect" on parents' ability to otherwise enter into global settlement agreements in divorce and custody cases. That also appears to be the understanding of this State's Bar. Specifically, in answering the question, "do the courts of this [S]tate have the authority to assess child support even if the issue has not been raised by either parties[,]" the Maryland State Bar Association, acting as amicus curiae in this case, stated: "The MSBA *has long understood that the answer to that question is 'yes,' based on the existing case law regarding child support.*" (Emphasis added).

**V**
**CONCLUSION**

---

[24] The parties vaguely allege an equal protection violation based on, what appears to be, the status of parents "who simply want to end their legal relationship as a married couple[.]" No such allegation was raised in the circuit court, so this issue—even if a legitimate one—is not preserved for appellate review, and we exercise our discretion not to address it. *See* Md. R. 8-131(a) ("Ordinarily, an appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court . . . .").

We hold that, in a divorce and custody matter, parents may not bilaterally agree to waive the issue of child support because child support is a statutory right held by the minor child that cannot be waived or bargained away. We also hold that a parent's inability to waive the issue of child support does not infringe on a parent's right to determine their child's upbringing because the parental rights protected by the Fourteenth Amendment do not include the right to evade a legal obligation to support one's minor child. Lastly, we hold that, in this case, the trial court did not abuse its discretion when it declined to adopt the parties' request to award no child support in an above-guidelines case because the parties failed to proffer any reason sufficient to the trial court to justify that determination.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND AFFIRMED. COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**